# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

NORMAN SANDERS (#197433)                           CIVIL ACTION

VERSUS

N. BURL CAIN, ET AL.                               NO. 11-0227-JJB-RLB

## RULING

This matter comes before the Court on the defendants' Motion for Summary Judgment, rec.doc.no. 72. This motion is opposed.

The pro se plaintiff, an inmate confined at the Louisiana State Penitentiary ("LSP"), Angola, Louisiana, brought this action pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc, et seq., originally asserting claims against Warden N. Burl Cain, Dpty Warden Darrel Vannoy, Ass't Warden Cathy Fontenot, Ass't Warden Leslie Dupont, Dpty Warden Richard Peabody, Ass't Warden Orville Lamartinere, Ass't Warden Kevin Benjamin, Ass't Warden Tim Delaney, Lt. Col. Jeremy Mackee, Director John H. Robson (of the New Orleans Baptist Theological Seminary ("NOBTS")), and Chaplain Brad Delaughter, complaining that he was retaliated against for filing an administrative grievance in April, 2010, and that he has been subjected to religious discrimination in violation of his constitutional rights. Pursuant to Order dated June 30, 2011, the Court granted the plaintiff leave to amend his Complaint, adding as a defendant Ass't Warden Joseph Lamartinere and voluntarily dismissing his claims asserted against defendant Orville Lamartinere. See rec.doc.nos. 18 and 27.[1]

---

[1]     A review of the record reflects that defendant Jeremy Mackee has not been served. When the plaintiff was directed to provide information to the United States Marshal's Office relative to the identities of the defendants to be served – specifically by completing and returning the Marshal's Form 285 – the plaintiff did not include defendant Mackee in the list of defendants on the returned form. See rec.doc.no. 14. As a result, defendant Mackee was not served and has not appeared in this proceeding. In addition, the plaintiff has failed thereafter to take any action to obtain service on this defendant. Although an inmate plaintiff is entitled to rely upon service by the United States Marshal, "a plaintiff may not remain silent and do nothing to effectuate such service. At a minimum, a plaintiff should attempt to remedy any apparent service defects of which a plaintiff

The defendants move for summary judgment relying upon the pleadings, Statements of Undisputed Facts, certified copies of the plaintiff's pertinent administrative remedy proceedings, certified copies of the prison records of the plaintiff and co-inmates Carter Peterson and Paul Gray (who have signified their faith as being Mormon), certified copies of the prison records of 18 additional co-inmates (who have expressed interest in attending Mormon meetings and services but who have not signified their faith as being Mormon), certified copies of records reflecting Mormon call-outs at the main prison complex between April and September, 2010, a certified copy of a memorandum dated April 26, 2007, authorizing the plaintiff to conduct Mormon services/study at the main prison interfaith chapel, a certified copy of an undated "Mormon Religious Report" indicating that Mormon inmates, averaging 9 in number, conduct meetings/services six times per month at the main prison, a listing of books and materials possessed by the plaintiff pertaining to the Mormon faith, certified copies of Mormon attendance records and religious programing records for dates between 2009 and 2011, a certified copy of the plaintiff's Conduct Record and Location Sheets, certified copies of Camp C Religious Attendance Rosters between July, 2010, and January, 2011, certified copies of excerpts from the plaintiff's mental health records, certified copies of Department of Corrections Regulation No. B-08-017 (relative to "Faith and Character Based Dormitory Program"), LSP Directive No. 26.001 (relative to "Religious Advisors"), LSP Posted Policy No. G-01 (relative to "Callouts"), LSP Directive No. 23.002 (relative to "Faith-Based Programs and Services"), and LSP Directive No. 22.003 (relative to "Offender Organizations"), and the affidavits of Rhonda Z. Weldon and defendants Burl Cain, Kevin Benjamin, Brad Delaughter, Leslie Dupont, Cathy Fontenot, Richard Peabody and Darrel Vannoy.

---

has knowledge." Rochon v. Dawson, 828 F.2d 1107 (5th Cir. 1987). The plaintiff is presumed to have knowledge of the non-service in the instant case both because he provided the referenced list to the Marshal's Office (omitting defendant Mackee's name) and also because he has been served with all subsequent pleadings which reflect no appearance having been made by this defendant. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, the failure of a plaintiff to serve a defendant within 120 days of commencement of an action is cause for dismissal of that defendant from the proceedings. It is appropriate, therefore, that the plaintiff's claims asserted against defendant Jeremy Mackee be dismissed, without prejudice, for failure of the plaintiff to timely effect service upon this defendant.

Pursuant to well-established legal principles, summary judgment is appropriate where there is no genuine disputed issue as to any material fact, and the moving party is entitled to judgment as a matter of law. Rule 56, Federal Rules of Civil Procedure. Celotex Corporation v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A party moving for summary judgment must inform the Court of the basis for the motion and identify those portions of the record, including pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, that show that there is no such genuine issue of material fact. If the moving party carries its burden of proof under Rule 56, the opposing party must direct the Court's attention to specific evidence in the record which demonstrates that the non-moving party can satisfy a reasonable jury that it is entitled to a verdict in its favor. Anderson, supra. This burden is not satisfied by some metaphysical doubt as to alleged material facts, by unsworn and unsubstantiated assertions, by conclusory allegations, or by a mere scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069 (5th Cir. 1994). Rather, Rule 56 mandates that summary judgment be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. Celotex, supra. Summary judgment is appropriate in any case where the evidence is so weak or tenuous on essential facts that the evidence could not support a judgment in favor of the non-moving party. Little, supra, 37 F.3d at 1076. In resolving a motion for summary judgment, the Court must review the facts and inferences in the light most favorable to the non-moving party, and the Court may not evaluate the credibility of witnesses, weigh the evidence, or resolve factual disputes. International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257 (5th Cir. 1994), cert. denied, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992).

In the plaintiff's Complaint, as amended, he asserts that he is a practicing Mormon and that, commencing in 2007, when he graduated from the NOBST Bible College at LSP, he has been allowed to conduct Mormon services at the prison and is the self-proclaimed leader of the Mormon community at the prison. He asserts that on April 6, 2010, he and 4 other Mormon inmates filed administrative grievances complaining that they were being discriminated against based upon their

religion, specifically that the Mormon community was not provided with an opportunity to conduct worship services on Sundays at the main prison interfaith chapel, that the Mormon community was not being provided with office space or allowed to form a club for the purpose of holding fund-raisers to purchase religious books and materials, and that the NOBST Bible College was disseminating information that the Mormon faith constituted a "cult". In apparent response to this grievance, the plaintiff was called to a meeting with Chaplain Brad Delaughter on April 13, 2010, who listened to the plaintiff's complaints, informed the plaintiff that there were no available Sunday time periods at the main prison interfaith chapel, and advised the plaintiff that his complaint would be addressed by administration officials. Three days later, on April 16, 2010, the plaintiff was transferred without ceremony to Camp C at LSP, an outcamp separated from the main prison complex. On April 19, 2010, the plaintiff was called to the Camp C Warden's Office and was informed by Ass't Warden Delaney that he was being assigned as a Mormon inmate minister at the Camp C chapel and would be conducting religious services on Sundays at the chapel. The plaintiff asserts, however, that there were no other Mormon inmates housed at Camp C with whom he could congregate and worship. The plaintiff also complains that he was not immediately provided with access to the Camp C hobbyshop after his transfer. He acknowledges, however, that after speaking with defendant Mackee at Camp C in April, 2010, defendant Mackee placed the plaintiff's name at the top of the list for the assignment of a hobby box. The plaintiff complains, however, that he was not provided with a box until September, 2010, although other inmates allegedly obtained such boxes in the interim through favoritism or by purchasing same. On April 27, 2010, the plaintiff filed a second administrative grievance, complaining that his transfer to Camp C had been retaliatory in nature and that it was hindering the practice of his religion. Specifically, the plaintiff complained that there were no other Mormons at Camp C with whom he could worship and congregate and that he was still being prevented from holding a fund-raiser for the purpose of raising money to purchase religious books and materials. Finally, on May 28, 2010, the plaintiff was called to a meeting with defendant Warden Cain and was informed that the reason for the plaintiff's transfer had been to facilitate the

practice of the plaintiff's faith by providing greater access to the lesser-used chapel at Camp C, and by providing access to a well-funded "concept club" at Camp C that could purchase needed books and materials. Notwithstanding, the plaintiff complains that he was never permitted by the Camp C "concept club" to hold a fund-raiser, and the concept club did not offer to purchase any books or materials on his behalf.

In addition to the foregoing, the plaintiff asserts that on numerous occasions, he requested permission from defendant Delaney to be allowed to travel on call-outs from Camp C to the main prison complex for weekly Mormon gatherings and for services at the main prison, but defendant Delaney refused these requests and/or failed to respond thereto. The plaintiff asserts that this refusal was discriminatory because inmates of other religious denominations were allegedly allowed to attend such services and functions at the main prison complex. In addition, the plaintiff complains that notwithstanding an inability to participate in Mormon call-outs, prison officials compelled him to attend and participate in other protestant call-outs, thereby violating his rights under the Establishment Clause of the United States Constitution. Finally, the plaintiff complains that on October 1, 2010, he was charged with a false and retaliatory disciplinary report and was sentenced to segregated confinement, where he remained for approximately a year. He prays for compensatory, nominal and punitive damages and for declaratory and injunctive relief against the defendants.

<u>Compensatory Damages - Limitation on Recovery</u>

In addressing the plaintiff's claims, the Court first finds that the plaintiff's claim for compensatory damages fails as a matter of law. Initially, the Fifth Circuit has held that RLUIPA does not authorize a private cause of action for money damages against state prison personnel for actions taken in either their official or their individual capacities. <u>Sossamon v. Lone Star State of Texas</u>, 560 F.3d 316 (5th Cir. 2009), <u>affirmed</u>, __ U.S. __, 131 S.Ct. 1651, 179 L.Ed.2d 700 (2011). Further, with regard to the plaintiff's claims asserted under 42 U.S.C. § 1983, this statute "does not provide a cause of action against states or state employees in their official capacities for damages."

Id., citing Will v. Michigan Dept. of State Police, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). And finally, with regard to the plaintiff's individual capacity claim for monetary damages under § 1983, a prisoner plaintiff is barred from the receipt of compensatory damages for mental or emotional injury in the absence of some showing of physical injury. See 42 U.S.C. § 1997e(e). In the instant case, the plaintiff has not alleged that he sustained any physical injury as a result of the defendants' alleged wrongdoing. Accordingly, this aspect of the plaintiff's claim must also be rejected. Although the plaintiff might still be entitled to recover nominal or punitive damages from the defendants in their individual capacities under § 1983, see Hutchins v. McDaniels, 512 F.3d 193 (5th Cir. 2007), he would still need to establish some constitutional violation by the defendants in order to merit such recovery.

In addition to the foregoing, the plaintiff also prays for declaratory and injunctive relief. Whereas the defendants are correct that the recovery of even nominal or punitive damages from the defendants in their official capacities is precluded by Eleventh Amendment sovereign immunity, see Hafer Hafer v. Melo, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), a claim for prospective relief asserted in federal court against a defendant acting in an official capacity is not prohibited under the Eleventh Amendment because such a suit is not treated as an action against the state. Will v. Michigan Department of State Police, supra. See also 15 Am.Jur.2d Civil Rights § 101.

Exhaustion of Administrative Remedies

In response to the plaintiff's allegations, the defendants also assert that the plaintiff has failed to exhaust administrative remedies, as mandated by 42 U.S.C. § 1997e, relative to certain of his claims. Pursuant to this statute, the plaintiff was required to exhaust administrative remedies available to him at the prison prior to commencing a lawsuit in federal court relative to prison conditions. This provision is mandatory and applies broadly to "all suits about prison life". Porter v. Nussle, 534 U.S. 516, 122 S.Ct. 983, 152 L.ed.2d 12 (2002). Further, a prisoner must exhaust his administrative remedies by complying with applicable prison grievance procedures before filing

a suit related to prison conditions. <u>Johnson v. Johnson</u>, 385 F.3d 503 (5th Cir. 2004). Not only must the prisoner exhaust all available remedies, but such exhaustion must be proper, including compliance with an agency's deadlines and other critical procedural rules. <u>Woodford v. Ngo</u>, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). One of the primary purposes for the administrative exhaustion requirement is to provide fair notice to prison officials of an inmate's specific complaints so as to provide "'time and opportunity to address complaints internally.'" <u>Johnson v. Johnson</u>, <u>supra</u>.

From a review of the plaintiff's administrative record, it appears that the plaintiff filed and exhausted two administrative grievances relative to the issues before this Court. In the first grievance, ARP No. LSP-2010-1028, which was filed on April 6, 2010, prior to his transfer on April 16, 2010, the plaintiff complained of alleged discrimination against Mormon adherents at LSP, including the failure of prison officials to allow Mormons to conduct services on Sundays, the failure to afford club status to Mormons for the purpose of holding fund raisers and generating money to purchase religious books and materials, the failure to afford office space to Mormons of its "ministry" work, and the dissemination of negative information by prison personnel relative to Mormonism being a "cult". In the second grievance, ARP No. LSP-2010-1227, filed on April 27, 2010, after the referenced transfer, the plaintiff complained that the transfer had been undertaken in retaliation for his prior grievance and that the transfer was hindering the practice of his faith, specifically because there were no other Mormon adherents at Camp C with whom the plaintiff could worship and congregate. In addition, the plaintiff alleged in the second grievance that he had "lost his hobby shop privileges" as a result of the transfer whereas these privileges should have been retained with a non-punitive lateral transfer.

Based on the foregoing, it appears that certain of the plaintiff's claims are subject to dismissal for failure to exhaust administrative remedies. Specifically, there is no reference in either grievance to events occurring, at the latest, after June 21, 2010, on which date the plaintiff apparently submitted a response to a First Step denial of ARP No. LSP-2010-1227. As a result,

there is clearly no exhaustion of the plaintiff's claim that on October 1, 2010, he was charged with a false and retaliatory disciplinary report. In addition, there is no reference in either grievance to the plaintiff being "forced to attend protestant services and functions" or to the alleged failure of prison officials, after the plaintiff's transfer, to allow the plaintiff to travel from Camp C to the main prison for weekly call-outs, whereas the adherents of other faith-based groups were allegedly allowed to do so. As to this latter claim, while the plaintiff's grievance adequately states a claim that his transfer to Camp C hindered the practice of his religious beliefs, notably through a separation from his congregation which prevented him from worshiping with other Mormons, the grievance fails to adequately present a claim of disparate or unequal treatment in this context, i.e., a claim that members of other faith-based groups were treated differently and allowed to attend call-outs whereas he was not. Accordingly, the Court finds that these claims have not been administratively exhausted and must be dismissed.

Lack of Personal Involvement

In addition to the foregoing, the Court further finds that the plaintiff has failed to sufficiently allege the personal participation of many of the defendants in the events alleged. In this regard, in order for an official to be found liable under RLUIPA or § 1983, the official must have been personally and directly involved in conduct causing an alleged deprivation of an inmate's constitutional rights or there must be a causal connection between the actions of the official and the constitutional violation sought to be redressed. Lozano v. Smith, 718 F.2d 756, at 768 (5th Cir. 1983). Any allegation that the defendants are responsible for the actions of their subordinates or co-employees is alone insufficient to state a claim under § 1983. Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Further, in the absence of direct personal participation by a supervisory official in an alleged constitutional violation, an inmate plaintiff must establish that the deprivation of his constitutional rights occurred either as a result of a subordinate's implementation of the supervisor's affirmative wrongful policies or as a result of a breach by the supervisor of an affirmative duty specially imposed upon him by state law. Lozano

v. Smith, supra.

In the instant case, the plaintiff provides very little factual detail relative to the alleged personal involvement of the individual defendants in the violations alleged. Whereas he effectively asserts that defendant Cathy Fontenot was directly involved in failing to provide club status to the Mormon community, that defendant Cain was instrumental in making the decision to transfer the plaintiff to Camp C, that defendant Delaney, the assistant warden in charge of Camp C, was involved in the deprivations allegedly suffered by the plaintiff at that location, and that defendant Robson personally disseminated information relative to Mormonism being a "cult," the plaintiff has failed to sufficiently allege the personal involvement of the remaining defendants in the events alleged.[2] Specifically, other than these specific factual allegations relative to these defendants, the remaining assertions in the Complaint consist of no more than conclusory statements and legal assertions regarding the alleged involvement of the defendants, such as, for example, "[t]he actions of [list of defendants omitted] in denying plaintiff and Mormons club status ... was discriminatory, arbitrary and capricious which violated the First and fourteenth Amendments ...." See Complaint, rec.doc.no. 8, at ¶ 35. In the Court's view, these conclusory assertions are mere statements relative to legal liability and fail to sufficiently reflect any direct and personal participation by the stated defendants in the constitutional violations alleged. Accordingly, the Court finds that, with the exception of defendants Burl Cain, Cathy Fontenot, Tim Delaney and John Robson, the plaintiff's allegations of personal involvement are deficient, and these defendants are entitled to dismissal from this proceeding.[3]

---

[2] Whereas the plaintiff makes reference to a meeting with defendant Brad Delaughter on April 13, 2010, which meeting was allegedly convened at the request of defendant Cathy Fontenot, this allegation does not reflect any participation in wrong-doing by defendant Delaughter. To the contrary, the plaintiff asserts that the defendant merely talked with the plaintiff about the complaints made in the plaintiff's grievance.

[3] The Court further notes that the plaintiff also failed to include any mention of the named defendants in the grievances which he filed relative to the claims asserted herein, thereby failing to exhaust administrative remedies as to his claims asserted against them. See Johnson v. Johnson, supra (addressing the need, usually, to identify in an administrative grievance the prison personnel who have allegedly violated an inmate's constitutional rights).

## The Plaintiff's Defamation Claim

Turning to a substantive review of the plaintiff's claims asserted against the remaining defendants, the Court addresses first the plaintiff's claim asserted against defendant John Robson, specifically that this defendant has disseminated information at LSP suggesting that the Mormon faith constitutes a "cult". The plaintiff asserts that the dissemination of this information has prejudiced the Mormon community and subjected him and other Mormon adherents at LSP to ill treatment.

The plaintiff's claim in this regard is not one of constitutional dimension. Injury to reputation, without more, is not a liberty interest protected under the Fourteenth Amendment to the United States Constitution. Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). See also Siegert v. Gilley, 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Thus, the plaintiff may not here complain that he has been harmed by the mere communication of defendant Robson's opinion or belief that the Mormon faith constitutes a "cult". And in any event, the plaintiff does not have standing before this Court to champion the constitutional rights of the Mormon Church, as such, or to assert the civil rights of third parties, i.e., other Mormon inmates, who have allegedly been harmed by the defendant's alleged unlawful conduct. Coon v. Ledbetter, 780 F.2d 1158 (5th Cir. 1986). Accordingly, the plaintiff has failed to state a claim against defendant Robson, and this claim and defendant are entitled to dismissal.

## The Plaintiff's Retaliation Claim

Turning next to the plaintiff's contention that his transfer to Camp C from the main prison complex to Camp C on April 16, 2010, was undertaken in retaliation for his filing of an administrative grievance on April 6, 2010, the defendants respond to this contention by asserting that they are entitled to qualified immunity in connection with the plaintiff's claims. Specifically, the defendants contend that the plaintiff has been and will be unable to produce evidence of conduct on the defendants' part which rises to the level of a violation of the plaintiff's clearly established constitutional rights.

The qualified immunity defense is a familiar one and, employing a two-step process, operates to protect public officials who are performing discretionary tasks. Hale v. Townley, 45 F.3d 914 (5ᵗʰ Cir. 1995).[4] As enunciated in Saucier v. Katz, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the first step in the analysis is to consider whether, taking the facts as alleged in the light most favorable to the plaintiff, the defendants' conduct violated the plaintiff's constitutional rights. Second, the district court looks to whether the rights allegedly violated were clearly established. This inquiry, the Court stated, is undertaken in light of the specific context of the case, not as a broad, general proposition. The relevant, dispositive inquiry in determining whether a constitutional right was clearly established is whether it would have been clear to a reasonable state official that his conduct was unlawful in the situation which he confronted. Id.[5]

Employing the above methodology, the Court ultimately rejects the plaintiff's contention that the transfer of April 16, 2010, was undertaken in retaliation for his exercise of constitutional rights. In this regard, in order to state a valid claim of retaliation under § 1983, a prisoner must allege "(1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his ... exercise of that right, (3) a retaliatory adverse act, and (4) causation." Jones v. Greninger, 188 F.3d 322 (5ᵗʰ Cir. 1999). An inmate must allege more than his personal belief that he is the victim of retaliation, Johnson v. Rodriguez, 110 F.3d 299 (5ᵗʰ Cir.), cert. denied, 522 U.S. 995, 118 S.Ct. 559, 139 L.Ed.2d 400 (1997), and he "must produce direct evidence of motivation or, the more probable scenario, 'allege a chronology of events from which retaliation may plausibly be inferred.'" Woods v. Smith, supra. The purpose of allowing retaliation claims under § 1983 is to ensure that prisoners are not unduly discouraged from exercising their constitutional rights. Morris v. Powell, 449 F.3d

_____

[4]     Qualified immunity is not available in connection with claims for declaratory and injunctive relief. Mayfield v. Texas Dept. of Criminal Justice, 529 F.3d 599 (5ᵗʰ Cir. 2008).

[5]     The United States Supreme Court has held that rigid chronological adherence to the Saucier two-step methodology is no longer mandatory. Pearson v. Callahan, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Although the Saucier methodology will be "often beneficial", the Callahan Court leaves to the lower courts discretion as to the order in which they may wish to address the two prongs of the qualified immunity analysis.

682 (5th Cir. 682). However, inasmuch as claims of retaliation are not favored, it is the plaintiff's burden to provide more than mere conclusory allegations of retaliation:

> To state a claim of retaliation an inmate must ... be prepared to establish that but for the retaliatory motive the complained of incident ... would not have occurred. This places a significant burden on the inmate.... The inmate must produce direct evidence of motivation or, the more probable scenario, allege a chronology of events from which retaliation may plausibly be inferred.

Woods v. Smith, supra, 60 F.3d. at 1166. Moreover, Courts must carefully scrutinize claims of retaliation with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in penal institutions. Id.

With regard to the mere fact of the plaintiff's transfer from the main prison complex to Camp C at LSP, the law is clear that the classification of prisoners is a matter left to the sound discretion of prison officials, Wilkerson v. Maggio, 703 F.2d 909 (5th Cir. 1983), and prison officials are granted broad administrative and discretionary authority over the institutions they manage and the lawfully incarcerated persons under their control. Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). So long as the conditions and degree of confinement faced by an inmate are within the sentence imposed and do not otherwise violate the Constitution, the due process clause does not itself subject a prison official's treatment of an inmate to judicial oversight. Id. See also Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Accordingly, although the plaintiff was clearly unhappy with his transfer to Camp C in April, 2010, he had neither a protected liberty interest in his housing assignment nor a legitimate expectation that he would remain at that location. Thus, it is clear that, without more, the plaintiff fails to state a claim of constitutional dimension relative to his mere transfer to Camp C as such.

Notwithstanding the foregoing, the plaintiff also asserts that the transfer to Camp C was effected by the defendants specifically in retaliation for the plaintiff's ARP and his complaints regarding the practice of his religious beliefs. This contention, however, is wholly conclusory, and the uncontested facts do not support a plausible inference of retaliation. The plaintiff's mere belief that the defendants ordered the transfer with retaliatory intent is not sufficient to support a claim in

the absence of articulable facts suggesting such motivation. While it appears that the transfer may have been undertaken, at least in part, in response to the plaintiff's grievance, this does not end the inquiry. Specifically, in the plaintiff's grievance of April 6, 2010, he complained principally of (1) the refusal of prison personnel to provide him with a place to conduct services on his "holy days", i.e., on Sundays, and (2) the failure of prison personnel to authorize a Mormon club so that he could hold fund-raisers for the purpose of purchasing religious books and materials. The plaintiff acknowledges that, in response to this grievance, he met with defendant Chaplain Delaughter on April 13, 2010, shortly after the filing thereof, and the defendant advised that there were no available time slots for Sunday worship at the main prison interfaith chapel. The plaintiff further acknowledges that, after the transfer on April 16, 2010, he was provided with a Sunday time period at the Camp C interfaith chapel for the purpose of holding services. He further acknowledges that, at a meeting thereafter conducted by Warden Cain on May 28, 2010, defendant Cain advised that the purpose of the transfer had been, inter alia, to provide the plaintiff with Sunday access to the Camp C interfaith chapel, which access was available because of under-utilization of the interfaith chapel at that Camp. Warden Cain further advised that although there was a moratorium on the formation of new clubs at LSP, the plaintiff could utilize the well-funded "concept club" at Camp C, which club would facility the purchase of religious books and materials and/or the holding of fund-raising events. Thus, it appears that the plaintiff's transfer in fact provided him, at least theoretically, with much of the relief requested in his grievance.

In addition to the foregoing, the plaintiff acknowledges that, at the same time as his transfer to Camp C, the self-proclaimed leaders of two other smaller faith-based groups, adherents of the Jewish and Rastafarian faiths at LSP, were also transferred to outcamps for a similar stated purpose, i.e., to more efficiently employ under-utilized outcamp facilities and to provide access to the outcamp "concept clubs" for some of the smaller faith-based groups at LSP. This fact undercuts the plaintiff's contention that his transfer was undertaken solely in retaliation for his filing of an administrative grievance on April 6, 2010, or for his making of other complaints. Specifically, it does

not appear that either of the self-proclaimed leaders of the other two faith-based groups had filed recent grievances prior to the transfer, yet they were similarly transferred.[6] Further, the plaintiff acknowledges that at the meeting with Warden Cain on May 28, 2010, the Warden called together all of the professed adherents of each of the three faith-based groups and offered to transfer any or all of them, with no loss of privileges, to the respective outcamps. This fact further undercuts the plaintiff's contention that his transfer was retaliatory. A stated willingness to transfer other inmates in order to facilitate the practice of their faith does not lead to an inference that the plaintiff's transfer was for the express purpose of taking adverse retaliatory action against him solely because of his complaints about the practice of his religious beliefs. Finally, the plaintiff has acknowledged that, at the same time that he filed his administrative grievance, no fewer than four additional grievances were filed by other Mormon inmates, asserting the same or similar claims regarding Sunday worship and club status. There is nothing in the record, however, to suggest that these inmates were thereafter transferred to outcamps in response to their complaints, which transfer would be expected had the plaintiff's transfer been undertaken in retaliation for his grievance. Thus, the Court concludes that the plaintiff's transfer has not been shown to have been undertaken in retaliation for his administrative filings or complaints.[7]

Similarly, the Court also finds that the transfer of April 16, 2010, was not undertaken in retaliation for the plaintiff's exercise of his religious beliefs. He expressly acknowledges that, prior to the transfer, he had been allowed for several years to practice his Mormon faith unimpeded at

---

[6]     One of the two religious leaders, Michael Birklett, was apparently requesting club status for his religious group but had not apparently filed an administrative grievance relative to this request.

[7]     Although the plaintiff makes reference to several oblique statements purportedly made by prison personnel relative to his filing of administrative grievances, the Court does not find that these statements establish a question of fact as to retaliatory intent. For example, the plaintiff asserts that on April 16, 2010, a Sgt. Swolle (not named as a defendant herein) advised the plaintiff not to take a typewriter to Camp C because "that's what got you in trouble", that on April 16, 2010, defendant Cathy Fontenot made the statement that "I had a long history of filing [grievances]," and that on April 16, 2010, defendant Burl Cain made a statement that "I was only in it for the money since I was seeking monetary damages in my [grievance]."

the main prison complex, to receive religious literature and materials, to meet weekly with the Mormon community for study, and to conduct services on the first and third Mondays of every month. Accordingly, while there appears to be an issue as to whether the transfer resulted in an obstruction of his religious rights, discussed below, it has not been shown to have been motivated by retaliatory animus.

The Plaintiff's Exercise of Religion Claim

Turning to the plaintiff's claim that his religious rights were violated by the refusal to allow Mormons to worship on Sundays at the main prison complex, by the refusal to allow club status to Mormons, by the refusal to allow office space to Mormons at the main prison complex, and by his transfer to Camp C, where he was unable to congregate with fellow members of his faith or hold fund-raisers for the purpose of purchasing religious books and materials, this claim is asserted under the Free Exercise Clause of the First Amendment, RLUIPA, and the Equal Protection Clause of the Fourteenth Amendment.

The Free Exercise Clause of the First Amendment, as applied to the states through the Fourteenth Amendment, prohibits conduct which unreasonably impinges upon the free exercise of an inmate's religious beliefs. Copeland v. Livingston, 464 Fed.Appx. 326 (5th Cir. 2012). While inmates retain their First Amendment religious rights notwithstanding their incarcerated status, the exercise of these rights is subject to reasonable restrictions and limitations necessitated by penological goals. O'Lone v. Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). See also Baranowski v. Hart, 486 F.3d 112 (5th Cir. 2007), citing Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A prison action or regulation that impinges upon an inmate's First Amendment constitutional rights is valid if it is reasonably related to legitimate penological interests. Turner v. Safely, supra. Under RLUIPA, government officials may not impose a substantial burden on the religious exercise of a person confined to an institution unless that burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000cc-1(a). Under RLUIPA, the plaintiff bears the initial

burden of proving that a challenged government action "substantially burdens" his "religious exercise", Mayfield v. Texas Dept. of Criminal Justice, 529 F.3d 599 (5th Cir. 2008). If the plaintiff meets that burden, the burden shifts to the government to "demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest." Id. "RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." Id. A government action imposes a substantial burden on religious exercise if it "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." Adkins v. Kaspar, 393 F.3d 570 (5th Cir. 2004), cert. denied, 545 U.S. 1104, 125 S.Ct. 2549, 162 L.Ed.2d 275 (2005). Whether the government action or regulation imposes a substantial burden on an adherent's exercise requires a case-by-case, fact-specific inquiry. Id. Although RLUIPA imposes strict scrutiny upon the imposition of certain religious limitations upon prisoners, the drafters of the statute were mindful that discipline, order and security are urgent in penal institutions, and they therefore anticipated that courts would apply the RLUIPA test "with due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." Cutter v. Wilkinson, 544 U.S. 709, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005).

Addressing first the plaintiff's claim under RLUIPA, he contends that prior to his transfer to Camp C, prison officials refused to allow him to attend or conduct services on Sundays, failed to provide office space for Mormons to do "ministry work", and refused to authorize club status to the Mormon community, thereby preventing the holding of fund-raisers. Of these, the Court concludes that only the first constitutes a "religious exercise" subject to analysis under the statute. Specifically, RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7). Whereas the conducting of religious services on the Mormon "holy day" easily qualifies as a "religious exercise", the mere use

of an office for organizational purposes and the mere formation of a prison club easily do not. Contrary to the plaintiff's assertion, access to an office or a computer or word processor was not necessary for the plaintiff to engage in any religious observance, to prepare a "proper sermon" or to generate "call-outs" for religious gatherings. Nor does the plaintiff explain how the formation of a prison club, even if religious in nature, constituted an "exercise of religion". Accordingly, a consideration of these latter alleged deprivations is more appropriately addressed as an alleged violation of the plaintiff's right to equal protection, particularly inasmuch as he asserts that other religious groups at LSP were treated more favorably in this context.

Having determined that the holding of services on the Mormon "holy day" is a "religious exercise", the Court next finds that the failure of prison officials to provide any opportunity to do so at the main prison complex results in a "substantial burden"on such exercise, specifically because it results in a complete inability to conduct such services. Further, the Court concludes that the defendants have not met their burden of showing that the imposition of this deprivation meets a compelling governmental interest or is the least restrictive available means to accomplish such interest. Specifically, although the defendants have asserted that there are or were no available times on Sundays for Mormons to worship at the main prison interfaith chapel, they have conceded that there are other locations at the main prison complex where such services might have been held, i.e., the education building, the visitor shed, the gym, or the new interfaith chapel at the main prison complex, and the plaintiff has not signified that a church or chapel was necessary for him to conduct religious services. In addition, although the defendants have asserted that the relative size of other faith-based groups has justified the preferential access of such groups to the interfaith chapel, the defendants have not provided any information regarding such other groups or the sizes thereof. Thus, there are factual questions which remain relative to this issue.[8]

_____

[8]    The plaintiff's claim regarding Sunday services at the main prison complex has not been rendered moot by his transfer to Camp C. There was and is a real possibility that the plaintiff may be returned to that location. It appears, in fact, that the plaintiff was transferred back to the main prison complex in September, 2012, and has since been transferred to Camp D at LSP. In the event that the plaintiff is transferred back to the main prison complex, he will presumably be

The plaintiff next complains that, after his transfer to Camp C, the exercise of his religious rights was burdened by an alleged inability to congregate with other members of his faith. Specifically, he asserts that although he was provided with a time slot to conduct Sunday services at the Camp C interfaith chapel, there were no Mormon adherents at Camp C and, as a result, the allowance of the Sunday time slots was a "sham".

The plaintiff has not established his entitlement to relief relative to this claim. Specifically, the evidence before the Court reflects that, of the more than 5,000 inmates confined at LSP, only three (3) have signified in their prison records that they are adherents of the Mormon faith. Although the plaintiff asserts that there are in fact twelve (12) additional inmates at LSP who profess to be Mormon adherents – but whose prison records have not been changed to reflect their faith – this is still an extremely small number of adherents when compared to the prison population as a whole. The evidence before the Court further indicates that, prior to the plaintiff's transfer to Camp C, meetings and services conducted by the Mormon faith at the main prison complex consisted, on average, of gatherings of nine (9) inmates. These records further indicate that after the plaintiff's transfer, meetings and services conducted at Camp C, during the months of July through September, 2010, consisted of between four (4) and (8) inmates (averaging approximately five (5) inmates). The plaintiff has also provided an affidavit prepared by one of these inmates, Nelson Tippen, who attests that he converted to the Mormon faith in early 2010, while confined with the plaintiff at Camp C. It thus appears that the plaintiff, after his transfer, had not only a place to conduct services on his "holy day", but also at least one fellow Mormon and other persons interested in the Mormon faith with whom he could congregate and worship. On this showing, the plaintiff has not established that a substantial burden was placed upon his exercise of religious rights at Camp C.

Finally, the plaintiff complains that, while at Camp C, he was not allowed access to the "concept club" to hold a fund-raising dinner for the purpose of generating funds to purchase religious

_____

subjected to the same prison policies. See Sossamon v. Lone Star State of Texas, supra.

books and materials and was not provided with a hobby shop box through which he could generate such funds. Again, however, the plaintiff has neither alleged nor shown that the holding of a fund-raiser, the engaging in hobby craft, or even the purchasing of religious books and materials is a "religious exercise" which is an important part of his Mormon faith. Nor has he shown that such exercise was "substantially burdened" by the defendants' conduct. Specifically, he has not asserted that he was not in possession of a Bible, a Book of Mormon, or any other book or thing that was important for the exercise of his faith. To the contrary, he has acknowledged that he possessed an extensive collection of religious books and teaching materials for use in conducting study groups, services and worship. In addition, the defendants assert that the plaintiff ordered additional such materials in September, 2010, during the time that he was confined at Camp C. Thus, the Court is unable to conclude that the plaintiff has shown that a substantial burden was placed on the exercise of his religious rights in this context under RLUIPA.

Turning to the plaintiff's claim that his First Amendment constitutional rights have been violated by the defendants' conduct, this claim, as a practical matter, is only relevant to the plaintiff's individual-capacity-damages claim asserted under § 1983. See Sossamon v. Lone Star State of Texas, supra (recognizing that because declaratory and injunctive relief under RLUIPA are more easily obtained in light of RLUIPA's strict scrutiny standard, this largely obviates the need for a First Amendment analysis where the RLUIPA claim is allowed to proceed; also recognizing that since RLUIPA does not afford a private cause of action for monetary damages, a plaintiff's claim for such damages must be evaluated under the First Amendment). Relative to the First Amendment, the Fifth Circuit has stated that, in reviewing prison policies or actions which impinge upon an inmate's constitutional right to the free exercise of his religious beliefs, courts should apply the deferential standard set forth in Turner v. Safley, supra. See Baranowski v. Hart, supra. Under Turner, a prison action or regulation that impinges upon an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests. Id. In making this determination, the Court is directed to consider four factors: (1) whether a valid and rational connection exists between the

prison regulation and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right that remain open to prison inmates; (3) the impact of the accommodation on prison guards, other inmates, and the allocation of prison resources generally; and (4) whether there are "ready alternatives" to the regulation in question. Id. In evaluating a First Amendment claim in this context, "the pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." Adkins v. Kaspar, supra.

Applying the Turner factors, and for the same reasons stated in connection with the plaintiff RLUIPA claim, the Court finds that there are disputed issues of fact relative to the refusal of prison officials to allow Mormons to congregate for worship services on Sundays at the main prison complex. Otherwise, as discussed below, the Court finds no violation of the plaintiff's constitutional rights. Specifically, it appears from the exhibits provided by both parties that commencing in 2007, the plaintiff was allowed to begin conducting Mormon gatherings on a weekly basis and Mormon religious services twice monthly (on Mondays) at the main prison complex at LSP. When the plaintiff then began requesting permission to conduct services on his "holy days", i.e., on Sundays, and to form a Mormon club for the purpose of raising money to purchase religious books and supplies, a determination was made, in light of these requests and because of the great demand for club status and chapel time by various religious groups at the main prison complex, including groups comprising larger numbers of adherents, to move the plaintiff to an LSP outcamp where Sunday worship could be accommodated in the under-utilized outcamp chapel and where an outcamp "concept club" could be utilized for the purchase of religious books and materials. A decision was made at the same time to move the leaders of two other smaller denominations, Rastafarian and Jewish faith adherents, to outcamps for the same reason. After the transfer to Camp C on April 16, 2010, a meeting was conducted by defendant Cain on May 28, 2010, where defendant Cain explained the reason for the transfer and offered an opportunity to other members of the respective groups to also transfer to the outcamps. The plaintiff acknowledges that at Camp

C, he was classified as a Mormon Inmate Minister and was provided both with weekly time slots on Saturdays for religious studies and weekly time slots on Sundays for religious services at the Camp C interfaith chapel. Although the plaintiff complains that there were no Mormon inmates at Camp C, it appears that the weekly gatherings at the outcamp consisted of five (5) inmates on average, whereas the prior weekly gatherings at the main prison complex appear to have consisted of only nine (9) inmates on average. This disparity does not appear to be significant. And although the plaintiff complains that he still was not allowed to hold a fund-raiser for the purpose of purchasing religious books and materials, he acknowledges that he possessed an extensive supply of such books and materials already, which he could use in the practice of his faith.

Based on the foregoing, the Court finds no violation of the plaintiff's First Amendment constitutional rights. As applied to the states through the Fourteenth Amendment, the First Amendment protects an inmate's sincerely held religious beliefs and practices. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (drawing a distinction between unprotected "matter[s] of personal preference" and protected "deep religious conviction[s]"). Where a prison action restricts one aspect of an inmate's religious practice, but the inmate retains the "ability ... to participate in other religious observances of [his] faith", courts often reach the conclusion that the prison action at issue is reasonable. O'Lone v. Estate of Shabazz, 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). In addition, the law is clear that "[a] special chapel or place of worship need not be provided for every faith regardless of size". Cruz v. Beto, 405 U.S. 319, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). It is permissible, therefore, for prison officials to consider the demand and need of any group requesting access to a place of worship, including space and staffing limitations, when deciding where religious groups will conduct their services. Id. (noting that the Constitution does not demand that every religious group, regardless of size, have identical facilities or access). The mere fact that prison officials may have previously allowed the plaintiff to practice his faith at the main prison complex does not mean that they were constitutionally required to continue to do so.

Applying the <u>Turner</u> factors, it appears from the evidence adduced by the parties that the action of prison officials in transferring the plaintiff to Camp C – which was for the purpose of more effectively using the under-utilized Camp C chapel and facilitating the purchase of religious books and materials by smaller religious groups – was reasonably related to the legitimate penological interest of making efficient use of limited space and resources for such groups at LSP. By transferring the plaintiff to Camp C, prison officials were able to provide him with the opportunity, which he had requested, to conduct services on his "holy days". After the transfer, the plaintiff was classified as an Inmate Minister at Camp C and was allowed to hold both weekly study gatherings and weekly Sunday services at the Camp C interfaith chapel. Although he was not apparently allowed to organize a fund-raiser, he acknowledges that he was already in possession of an extensive collection of religious books and materials for use in the practice of his religion. Further, although he complains that there were no Mormon adherents at Camp C, he nonetheless convened a regular gathering of between four and eight inmates who were interested in the Mormon faith, at least one of whom, in addition to the plaintiff, was a Mormon convert. Thus, notwithstanding the failure of prison officials to allow the plaintiff to also travel to the main prison and congregate with Mormon adherents for gatherings and services at that location and notwithstanding the failure of prison officials to allow the plaintiff to hold a fund-raiser and/or purchase religious books and materials through the "concept club", there is nothing to suggest that the plaintiff was unable to practice his religion and also to employ additional alternative means of exercising his religious beliefs through, for example, unaccompanied prayer, meditation and study in his living quarters. Further, accommodation of the plaintiff's wish to hold Sunday services at the main prison complex, regardless of space and time limitations and the needs of religious groups with larger numbers of adherents, would clearly tax the already limited time and resources of prison personnel and could "spawn a cottage industry of litigation and could have a negative impact on prison staff, inmates and prison resources." See <u>Freeman v. Texas Department of Criminal Justice</u>, 369 F.3d 854 (5th Cir. 2004). See also <u>Turner v. Safely</u>, <u>supra</u> (noting that "[w]hen accommodation of an asserted right

will have significant 'ripple effect' on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials"). Finally, the plaintiff has not proposed an alternative means of accommodation other than allowing him to unilaterally dictate to prison officials where he is allowed to live and practice his religious beliefs. This is an accommodation that the Court may not reasonably impose upon prison personnel. Accordingly, in light of the admittedly small number of practicing Mormon inmates at LSP, the Court finds that the plaintiff has failed to state a claim regarding the alleged violation of his First Amendment right to practice his religious faith.

Finally, the plaintiff asserts a claim under the Fourteenth Amendment that his right to equal protection has been violated by the defendants' conduct. In the equal protection context, the Fourteenth Amendment essentially directs that "all persons similarly situated should be treated alike." See Rolf v. City of San Antonio, 77 F.3d 823 (5th Cir. 1996). In order to successfully establish an equal protection claim, a civil rights plaintiff must allege and show that prison officials have acted with a discriminatory purpose, and a discriminatory purpose in this context "implies that the decision maker singled out a particular group for disparate treatment and selected his course of action at least in part for the purpose of causing its adverse effect on an identifiable group." Taylor v. Johnson, 257 F.3d 470 (5th Cir. 2001). A prisoner must allege either a specific act of discrimination or offer proof of discriminatory intent by prison officials; he may not rest an equal protection claim "on only his personal belief that discrimination played a part" in the complained-of act. McAlister v. Livingston, 348 Fed.Appx. 923 (5th Cir., 2009). Consideration of the four factors set forth in Turner, supra, is equally applicable in the equal protection context, Freeman v. Texas Dept. of Criminal Justice, supra. "Rationality is the controlling factor, and a court need not weigh each factor equally." Mayfield v. Texas Department of Criminal Justice, supra. In addition, as previously noted, it is permissible for prison officials to consider factors such as size, space and staffing limitations, when deciding where religious groups will conduct their services. Cruz v. Beto, supra.

In the instant case, the plaintiff has not established that any unequal treatment of which he

complains was the result of purposeful discrimination. To the contrary, he acknowledges that since 2007, prison officials have allowed Mormons to conduct weekly gatherings and hold services at the main prison complex. The mere fact that other faith-based groups of larger size were allowed to utilize the interfaith chapel on Sundays at the main prison complex does not establish discriminatory intent. In fact, the plaintiff acknowledges that defendant Delaughter suggested that Sunday worship could be allowed if it were to take place at a location other than the main prison intefaith chapel. And as to the ability to form a Mormon club, the plaintiff does not dispute the defendants' contention that a moratorium was placed on the formation of new religious clubs at LSP and that religious designations were being removed from existing clubs so as to avoid potential claims of discrimination. Further, the defendants have provided a non-discriminatory rationale for their decision to re-locate the self-proclaimed leaders of the three small faith-based groups to LSP outcamps, which re-location allowed for greater access to the interfaith chapels at those locations and for access to outcamp "concept clubs" for purchases of religious materials and potential fund-raising activities. Finally, the plaintiff has offered nothing to suggest that the alleged failure to provide him with a hobby box or with access to the "concept club" at Camp C was based on discriminatory animus. Thus, even if there is a question of fact relative to unequal treatment, the plaintiff's evidentiary showing does not show that the unequal treatment of which he complains was the result of intentional discrimination on the part of LSP officials. See McAlister v. Livingston, supra (rejecting equal protection claim even though the inmate plaintiff produced evidence of unequal treatment of his religious group); Sossamon v. Lone Star State of Texas, supra (same). Accordingly, this aspect of the plaintiff's claim must be rejected.

To the extent that the plaintiff seeks to invoke the supplemental jurisdiction of this Court over any potential state law claims, a district court is authorized to decline supplemental jurisdiction over such claims if the claims raise novel or complex issues of state law, if the claims substantially predominate over claims over which the district court has original jurisdiction, if the district court has dismissed all claims over which it had original jurisdiction, or for other compelling reasons. 28

U.S.C. § 1367.  In the instant case, based upon the record before it, the Court concludes that it is appropriate for the Court to decline to exercise supplemental jurisdiction over the plaintiff's state law claims.

Based on the foregoing,

**IT IS ORDERED** that the plaintiff's claims asserted against defendant Jeremy Mackee be and they are hereby dismissed, without prejudice, for failure of the plaintiff to serve this defendant within 120 days as mandated by Rule 4(m) of the Federal Rules of Civil Procedure.

**IT IS FURTHER ORDERED** that the Court declines to exercise supplemental jurisdiction over the plaintiff's state law claims.

**IT IS FURTHER ORDERED** that the defendants' Motion for Summary Judgment, rec.doc.no. 72, be and it is hereby **GRANTED IN PART**, dismissing the plaintiff's claims asserted against defendants John H. Robson, Darrel Vannoy, Leslie Dupont, Richard Peabody, Orville Lamartinere, Kevin Benjamin, and Brad Delaughter, with prejudice.

**IT IS FURTHER ORDERED** that the defendants' Motion for Summary Judgment, rec.doc.no. 72, be and it is hereby **DENIED IN PART**, dismissing all of the plaintiff's claims asserted against the remaining defendants, Burl Cain, Cathy Fontenot and Tim Delaney, **EXCEPT** the plaintiff's claims for nominal and punitive damages asserted against these defendants in their individual capacities under § 1983 and his claim for declaratory and injunctive relief asserted against these defendants in their official capacities under both § 1983 and RLUIPA arising out of the defendants' refusal to allow him to conduct religious services on Sundays at the main prison complex at LSP.

Baton Rouge, Louisiana, this _29th_ day of _MARCH_, 2013.

JAMES J. BRADY
UNITED STATES DISTRICT JUDGE